UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| ANNEX BOOKS, INC., ) <br> NEW FLICKS, INC. d/b/a New Flicks, ) <br> LAFAYETTE VIDEO & NEWS, INC. ) <br> d/b/a Lafayette Video & News, ) <br> KEYSTONE VIDEO & NEWSSTAND, ) <br> INC d/b/a Keystone Video, ) <br> SOUTHERN NIGHTS, INC., ) <br>           ) <br>         Plaintiffs, ) <br>           ) <br>     vs.     ) <br>           ) <br> CITY OF INDIANAPOLIS, ) <br>           ) <br>         Defendant. ) | No. 1:03-cv-00918-SEB-TAB |

## ORDER UPHOLDING CONSTITUTIONALITY OF CHAPTER 807 OF THE REVISED CODE OF THE CONSOLIDATED CITY AND COUNTY OF INDIANAPOLIS

This matter was tried to the Court on October 17-19, 2012, presenting the constitutional issues arising under the First and Fourteenth Amendments relating to Chapter 807 of the Revised Code of the Consolidated City and County of Indianapolis ("City-County Code"), which ordinance governs the licensing and regulation of adult entertainment establishments. Plaintiffs, Annex Books, Inc., New Flicks, Inc. d/b/a New Flicks, Lafayette Video & News, Inc., d/b/a Lafayette Video & News, Keystone Video &

1

Newsstand, Inc., d/b/a Keystone Video, and Southern Nights, Inc., are adult bookstores within the meaning of Ordinance 87,2003 ("the Ordinance").[1]

This is not our first encounter with these issues. Indeed, this litigation has a long history before our court as well as the Court of Appeals. When this cause of action was originally filed, Plaintiffs sought declaratory and injunctive relief prohibiting the enforcement of Chapter 807, as amended, which they contended violated their rights under the First and Fourteenth Amendments. On November 3, 2003, after a hearing, the Court preliminarily enjoined enforcement of the Ordinance pending "further order of the Court or a final resolution of the merits of the case." Docket No. 51, at 9. Defendant, the City of Indianapolis ("the City"), subsequently agreed to refrain from enforcing the Ordinance until a final decision on the merits was rendered. On April 1, 2005, the Court entered final judgment in favor of the City holding that enforcement of Chapter 807 did not violate Plaintiffs' constitutional rights.

Plaintiffs appealed that ruling and, on September 3, 2009, the Seventh Circuit affirmed the Court's judgment regarding the licensing procedure set out in the Ordinance, but reversed and remanded the case for an evidentiary hearing on the First Amendment issues. The mandate from the Seventh Circuit was issued on November 3, 2009. On remand, Plaintiffs requested and were granted leave to file a second amended complaint to include a claim for damages. On November 6, 2009, Plaintiffs also filed a motion for

---

[1] During the period of time when the Ordinance was not being enforced, Plaintiff New Flicks ceased its business operations and has not reopened. Thus, the parties have agreed that any injunctive relief is moot as to New Flicks.

preliminary injunction requesting that the Court enjoin the City from enforcing Chapter 807 until a final decision could be reached on the merits. On December 2, 2009, after a hearing during which both sides presented evidence and argument, the Court granted Plaintiffs' request for injunctive relief, enjoining the City from enforcing Chapter 807 until further order of the Court. That decision was affirmed by the Seventh Circuit on October 1, 2010.

The trial having now been completed, during which the Court received and considered documentary and testimonial evidence as well as heard the parties' oral arguments, we now hold that the Ordinance is valid under the First Amendment and may be enforced according to its terms.

Ordinance 87,2003 was approved by the City-County Council on October 6, 2003, and signed into law on October 14, 2003. Chapter 807 of the City-County Code regulates adult entertainment establishments, and, under the definitions set out in § 807-103, each of the plaintiffs qualifies as an "adult bookstore." Specifically, the Ordinance defines an adult bookstore as "an establishment having at least twenty-five percent (25%) of its (1) retail floor space used for the display of adult products; or (2) stock in trade consisting of adult products; or (3) weekly revenue derived from adult products."

Among other things, the Ordinance requires that Plaintiffs be licensed and that they close their store operations between midnight and 10 a.m. six days a week and remain closed all day on Sundays. The Ordinance also requires businesses with video booths to comply with section 807-301(h), which includes booth configuration, employee

3

monitoring, and minimum lighting requirements.[2] Each of the Plaintiffs offers adult oriented videos for sale, rental or display, as well as magazines and other materials. Annex Books is the only plaintiff that offers coin operated machines allowing its patrons to view sexually oriented videos in booths on the store's premises. The Ordinance was in effect between June 1, 2005 and December 2, 2009, prior to our issuance of the preliminary injunction.

Because the Ordinance is directed toward regulating secondary effects, it need survive only intermediate scrutiny. *See City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 448 (2002) (Kennedy, J. concurring). A law satisfies the intermediate scrutiny test so long as it is "designed to serve a substantial governmental interest and [does] not unreasonably limit alternative avenues of communication." *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 47 (1986); *see also Alameda Books*, 535 U.S. at 434. "Laws are designed to serve a substantial government interest when the 'municipality can demonstrate a connection between the speech regulated by the ordinance and the secondary effects that motivated the adoption of the ordinance.'" *Andy's Restaurant & Lounge, Inc. v. City of Gary*, 466 F.3d 550, 555 (7th Cir. 2006) (quoting *R.V.S., L.L.C. v. City of Rockford*, 361 F.3d 402, 408 (7th Cir. 2004)). To assess the sufficiency of this connection, courts must "examine evidence concerning regulated speech and secondary effects." *Alameda Books*, 535 U.S. at 441 (citing *Renton*, 475 U.S. at 50-52). "The First Amendment does not require a city, before enacting such an ordinance, to conduct new

---

[2] Plaintiffs are not challenging the provisions addressing booth configuration, employee monitoring, and lighting requirements.

studies or produce evidence independent of that already generated by other cities, so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses." *Renton*, 475 U.S. at 51-52.

In its decision remanding the case for an evidentiary hearing on the substantive First Amendment issues, the Seventh Circuit held that in order for the revised Ordinance to pass constitutional muster, the City must present evidence that adult book or video stores without live entertainment or private booths, open after midnight, or on Sunday, cause adverse secondary effects sufficiently severe to justify the curtailment of speech which results from the City's post-2003 system of regulation. *See Annex Books, Inc. v. City of Indianapolis, Ind.*, 581 F.3d 460, 465-67 (7th Cir. 2009) ("*Annex Books I*"). Thus, the City must establish: first, that adult entertainment businesses lacking facilities for on-premise viewing create the same secondary effects as establishments providing those services, and second, that the revised Ordinance requiring Plaintiffs to close from midnight to 10:00 a.m. Monday through Saturday and all day on Sunday "has the purpose and effect of suppressing secondary effects, while leaving the quantity and accessibility of speech substantially intact." *Id.* at 465 (quoting *Alameda Books, Inc.*, 535 U.S. at 449 (Kennedy, J., concurring)).

In determining whether the City has met its burden as elucidated by the Seventh Circuit in *Annex Books I*, we again rely heavily on the parties' respective analyses of the

crime statistics in Indianapolis before and after enforcement of the revised Ordinance.[3] We relied on a portion of these same statistics in our December 2, 2009 Order granting Plaintiffs' request for a preliminary injunction. However, we made clear in that ruling that the evidence and argument presented by the parties was only preliminary and that the statistical evidence would need further development at the full evidentiary hearing. Having now had the opportunity to review and evaluate the fully developed evidence, including the proffered statistical analyses, we hold for the reasons detailed below that the City has succeeded in making the necessary showing detailed in *Annex Books I* to satisfy the Constitutional requirements.

    First, consistent with the first prong of the test elucidated in *Annex Books I*, we find that the City has presented sufficient evidence to establish a reasonable basis for its legislative finding that adult businesses without on-premises viewing cause secondary effects similar to those caused by adult businesses offering such activities. As noted above, in reaching this conclusion, we rely heavily on the comparative crime statistics in Indianapolis before and after the Ordinance went into effect. Both parties' experts testified regarding the advantages associated with the use of before and after studies in which crime data in the vicinity of a sexually oriented business is collected for a time

---

[3] Much of the other evidence in the record before us, including a number of studies on which the City relied to justify the adoption of revised Chapter 807 and which it continues to cite in this litigation in support of the revised ordinance, was criticized by the Seventh Circuit in *Annex Books I*. Judge Easterbrook, writing for the panel, highlighted various deficiencies in those studies. He noted, for example, that none of the studies specifically dealt with the type of ordinance at issue here, to wit, an hours of operation restriction, nor did any of the studies assess the effects of stores that sell as little as 25% adult products, such as the businesses covered under the City's revised ordinance. Moreover, many of the studies concerned adult businesses that offer on-premise viewing booths, live shows, or both, while only one of the Plaintiffs in this lawsuit, to wit, Annex Books, offers such entertainment. Accordingly, the weight we accord these studies is greatly diminished in the Court's current analysis.

period before and after some change in its operation as a method of assessing secondary effects. In such a study, the sexually oriented business serves as its own control, eliminating many of the challenges associated with finding an area sufficiently similar to the area surrounding the sexually oriented business on characteristics known to be associated with crime to act as a control.

Here, the City studied Uniform Crime Reporting Part I crimes ("UCR Part I crimes")[4] that occurred within 500 feet of Plaintiffs' businesses during the pre-enforcement and enforcement periods.[5] This data, collected in a 2009 study ("the 2009 data"),[6] is the same data analyzed in our December 2, 2009 Order granting Plaintiffs' request for a preliminary injunction. In that Order, while noting the early juncture at which we were making our decision, we held that the City had failed to meet its burden as explicated in *Annex Books I* because, although there was statistical evidence from that 2009 study showing that violent/person crime (as opposed to property crime) had decreased while the Ordinance was in effect, the actual numbers were too small to be considered statistically significant so as to justify the reduction in speech effected by the

---

[4] The FBI has administered the Uniform Crime Reporting Program since 1930. There are eight crimes classified as Part I crimes within the UCR system, including the violent/person crimes of murder and nonnegligent manslaughter, forcible rape, robbery, and aggravated assault, and the property crimes of burglary, larceny-theft, and motor vehicle theft. Arson was subsequently added as the eighth Part I offense category.

[5] The pre-enforcement period ran from April 2002 through May 2005 (38 months) and the enforcement period was June 2005 through March 2008 (34 months). At the evidentiary hearing, Dr. Lintz opined that the four month difference between the two time periods would likely affect no more than a few crimes and the record supports this opinion. *See* Exh. P at 2, 12 (showing that only two crimes occurred at Plaintiffs' addresses between April and July 2008, neither of which occurred during the hours regulated by the Ordinance). Accordingly, this discrepancy is not material to our analysis.

[6] Plaintiff Southern Nights was included in all of the parties' original filings and remains listed on the Court's docket as a plaintiff in this litigation. However, it is not included in the 2009 data.

Ordinance.  However, having now had the benefit of further development and explanation of the data by the parties' experts at the evidentiary hearing, we understand the data more fully.  The expert testimony proffered at the hearing highlighted the importance of shifting our focus from simply the raw numbers of crimes to include an analysis of the underlying nature of those crimes as a way of putting the numbers in context.

At the evidentiary hearing, the City provided substantially more detail underlying the 2009 data.  Specifically, the City reviewed the police reports to identify the type of Part I crime reflected in the 2009 data as well as the specific address(es) at which each crime occurred.  On this basis, the City ranked the addresses within each 500 foot circle surrounding Plaintiffs' bookstores[7] according to the number of crimes that occurred at each of the addresses within that area.  The evidence shows that, in the pre-enforcement period, a total of 107 violent/person crimes occurred at all addresses within the 500-foot circles surrounding Plaintiffs' locations, 21 of which occurred *at* the five adult bookstore addresses (the four plaintiffs and another adult bookstore, Video Gallery).  Thus, approximately 20% of all violent/person crimes during the pre-enforcement period occurred at the adult bookstore addresses, even though the five adult bookstores represent only 3% of the 152 total addresses within the 500 foot circles that had at least one UCR Part I crime during the period.  Of those 21 violent/person crimes, 18 were armed robberies, and those 18 armed robberies at the adult bookstore addresses account for 46%

---

[7] According to Dr. McCleary's testimony, the 500 foot circumference (which is tantamount to an average city block) is a commonly used distance in secondary effects studies for both practical and empirical reasons.

of the total number (39) of armed robberies that occurred during the pre-enforcement period in all of the 500-foot circles. *See* Exh. M-4; Exh. M-5; and Exh. M-6.

Both parties' experts have endorsed and employed the use of this hotspot analysis, to wit, the ranking of addresses in a particular area based on crimes occurring at them. They agree that this is a recognized method of assessing secondary effects. Here, during the pre-enforcement period, Lafayette Video & News was ranked first in its buffer area for both total UCR crimes as well as armed robberies. In its area, New Flicks Video was third for total UCR crimes and first in armed robberies. Keystone Video & Newsstand was second in its circle behind the CVS Pharmacy in both total UCR crimes and armed robberies. Plaintiff Annex Books and another adult store, Video Galley, are located within the same 500-foot circle, and within that area, Annex Books and Video Gallery were third and fifth, respectively, in total UCR crimes and ranked first and second in armed robberies. *See* Exh. M-6. These rankings are consistent with Dr. McCleary's conclusion that adult bookstores are hotspots for serious crime, including armed robberies. *See* Exh. V at 2 (McClearly 2004 expert report: "The adverse secondary effects of [sexually oriented businesses] ordinarily involve robbery, ….").

The evidence also established that, during the period of time when the Ordinance was being enforced, overall violent/person crime, including the number of armed robberies, decreased at the adult bookstores, with the greatest decreases in total UCR Part I crimes (over 50%) coming during the regulated hours. *See* Exh. M-4; Exh. M-5; Exh. M-6. Specifically, total UCR Part I crimes at Plaintiffs' and Video Gallery's addresses

9

decreased during the overnight hours (midnight to 10 a.m.) from 12 crimes pre-enforcement to 5 crimes during the enforcement period and, on Sundays, from 8 crimes pre-enforcement to 3 crimes after. Exh. M-4. Total armed robberies committed at the adult bookstores during the regulated hours (overnight hours and Sundays combined) decreased from 8 during the period before the Ordinance was enforced to 0 during enforcement. *See* Exh. M-5. During the period of enforcement, violent/person crime as a whole decreased approximately 44% during the overnight hours within the 500 foot circles surrounding the bookstores, while violent/person crime in the balance of the IPD District rose almost 12% during that same time period. *See* Exh. 7A.

   To support their claims, Plaintiffs focus on the fact that, within the 500-feet circles surrounding Plaintiffs' premises, property crime and total UCR Part I crime rates as well as violent/person crime on Sundays all increased during the enforcement period. Specifically, property crime increased by: 16% overall; 32% during the overnight hours; and 20% on Sundays. Exh. 7. Overall UCR Part I crimes also increased in those areas by: 9% overall; 12% during the overnight hours; and 37% on Sundays. *Id.* Finally, Plaintiffs highlight that, although the violent/person crime rate decreased significantly in the 500-foot circles both overall as well as specifically during the overnight hours as described above, it increased from 8 to 19 crimes (138%) on Sundays during the enforcement period in the 500-foot circles surrounding Plaintiffs' locations. *Id.* Based on the overall testimony and evidence presented at trial, however, we are not persuaded that this excerpted data support a reliable conclusion.

The trial testimony establishes that focusing on violent/person crime both in the 500-foot circles surrounding Plaintiffs' bookstores, and even more narrowly, on violent/person crime occurring at the Plaintiffs' specific addresses, as opposed to total crime or property crime in this context is, for a number of reasons, more reasonable. First, one of the main challenges related to the assessment of secondary effects identified by the experts is the difficulty associated with accurately determining the time and exact location at which individual crimes occur in order to collect reliable data. Many property crimes, for example, cannot be reported in detail because the details are unknown (*e.g.* often property crimes like break-ins occur when the victim is away from his or her home or vehicle so the victim is unable to pinpoint with precision when the crime occurred). In contrast, because violent/person crimes involve a witness, usually the victim, the details of such crimes are generally more accurately reported, including the specific act that occurred as well as the time and location of the crime. Moreover, the City's expert, Dr. Richard McCleary, testified that relying on property crime rates in assessing secondary effects can be problematic because the property crime category is overwhelmed with larceny, and yet there are very few larcenies involved in secondary effects.[8] Dr. McCleary also testified that property crimes occur much more frequently than violent/person crime; thus, fluctuations in property crime can have a disproportionate effect on the total crime rate as well.

---

[8] Consistent with Dr. McCleary's opinion, the evidence shows that a significant percentage of the property crimes reflected in the 2009 data consist of shoplifting and larcenies occurring at Menards. *See* Exh. M-6.

11

Plaintiffs' expert, Dr. Daniel Lintz, among other witnesses, testified that there can be inaccuracies in coding crimes to particular locations when, as is true here, the 500-foot area around a sexually oriented business includes a large retail establishment or a strip mall or shopping center. Some large businesses have multiple addresses, which can lead to police reporting errors. Retail establishments located within strip malls and shopping centers may also affect the reliability of the data because it is common for the strip mall or shopping center to have a single address while the individual establishments and stores have suite numbers. If a police officer does not know the respective suite number of a particular establishment or store, the officer may assign a crime incident to an address belonging to the entire shopping center rather than the particular store at which the crime actually occurred, which clearly might skew the data. Dr. Lintz further testified that large parking lots that adjoin such businesses might also affect data, especially property crime numbers because property crimes happen with increased frequency at such locations. Another reliability issue noted by the experts arises when, as the experts testified here, a significant number of crimes are coded to intersections rather than specific addresses because in those cases, the exact location of the crime is not always discernible. The data collecting difficulties referenced here, while carefully considered by us, have not undermined our overall conclusion, however.

We found the testimony of both parties' experts who opined that one way to minimize such potential reliability issues is to review the underlying police reports, rather than relying merely on the machine-readable data, helpful and enlightening. In his

testimony, Dr. Lintz agreed that such an approach yields a more accurate assessment of the actual relationship between the adult bookstores and the offenses that occurred within the 500 foot circles.[9] In both his expert report and in his testimony, Dr. McCleary explained that he had identified numerous reliability issues associated with much of the machine-readable data he had received from Indianapolis, making it difficult to render opinions based on that data. However, he testified that manually reading a small sample of the police reports underlying the machine-readable data is a feasible way to collect reliable information. Both Lynn Phelps, the City's UCR coding specialist, and Jean Ritsema, the City's crime data facilitator, also testified regarding various difficulties inherent in crime-data collection and emphasized the importance of reading the underlying police reports in order to obtain reliable information about crime in Indianapolis.

As noted previously, the City used this method endorsed by the experts, namely, conducting a review of the underlying police reports, in order to create the detailed exhibits it submitted during the evidentiary hearing, which distinguished between the crimes committed at the bookstore addresses and the other addresses within the 500-foot circles and ranked those addresses within the 500-foot circles by number of crimes. The data contained in the supplemental exhibits presented by the City comprises the only evidence reflecting the underlying police reports. This more detailed and nuanced data shows that, during the period of time when the Ordinance was being enforced, the

---

[9] Dr. Lintz himself used this method in his studies in Seattle, Richmond, and Rancho Cordova, California.

greatest decreases in total UCR Part I crimes (over 50%) occurred during the regulated hours, and overall violent/person crime, including the number of armed robberies, also decreased at the adult bookstores during the enforcement period.  Moreover, although it is true as Plaintiffs point out that violent/person crime on Sundays increased significantly during the enforcement period in the 500-foot circles surrounding the adult bookstores, when the focus is turned specifically on the adult bookstore addresses, the data reveals that total UCR Part I crime decreased by over 50% (from 8 incidents pre-enforcement to 3 after) on Sundays at the adult bookstores themselves, and violent/person crime incidents at the adult bookstores on Sundays decreased from 3 incidents to 0.  *See* Exh. M-4; Exh. M-5.

As a final matter, the evidence establishes that violent/person crimes occur less frequently and are generally more serious than property crimes.  For example, though armed robbery is a very rare crime relative to other offenses, it is extremely dangerous, sometimes even resulting in homicide.[10]  Thus, while these raw numbers as such appear small, the City nevertheless has a clear and significant interest in reducing incidences of serious crimes such as armed robbery.  The testimony established that, merely because the numbers are small, they are not necessarily insignificant.  For example, Dr. McCleary testified that statistically speaking a randomly chosen hypothetical person in Indianapolis would have to wait 245 years before being a victim of an armed robbery.  He further testified that, if an address or intersection in Indianapolis were chosen at random, one

---

[10] In 1997, before the adoption of the ordinance, an individual was shot and killed during the commission of an armed robbery at Plaintiff Lafayette Video & News.

would have to wait approximately 99.1 years before an armed robbery occurred there. However, during the approximately six year period on which the summary of 2009 data is based, 26 armed robberies at the five adult bookstores (four Plaintiffs and Video Gallery) occurred. Thus, because armed robberies on the whole occur so infrequently, it is clear that the numbers attributable to the adult bookstores are in fact quite significant. This conclusion is consistent with Dr. McCleary's view that these locations, even those without live entertainment are hotspots for armed robbery.[11]

Our conclusion is further buttressed by an examination of evidence relating to areas outside of Indianapolis. As Judge Easterbrook noted in *Annex Books I*, the City is not required to use "local" evidence to show that adult businesses without on-premise viewing cause similar secondary effects as businesses that do offer such services. Apparently relying on that guidance, the City introduced an article co-authored by its expert, Dr. McCleary, which, based on his research, including his study conducted in Sioux City, Iowa, establishes a link between adult bookstores without live entertainment or private viewing and secondary effects crimes. Richard McCleary & Alan C. Weinstein, *Do "Off-Site" Adult Businesses Have Secondary Effects? Legal Doctrine, Social Theory, and Empirical Evidence*, 31 Law & Policy 217-35 (2009) ("McCleary Article"). In the McCleary Article, the authors theorize that: "To the extent that on-site

---

[11] Although Plaintiffs' expert, Dr. Daniel Lintz, testified that he would not consider Plaintiffs' businesses to be hotspots for crime because the raw numbers reflected in the 2009 data were de minimis, he did concede that, in determining whether a particular address was a hotspot, the type of crimes underlying the numbers would be information that would factor into his decision. He went on to testify that, even if a particular address would not be a hotspot for crime in general because the crime numbers were too small, it would still be possible for that location to be a hotspot for a particular type of crime.

15

and off-site adult bookstores attract high-value targets from wide catchment areas, both business types are expected to attract predators to their neighborhoods, thereby generating ambient victimization risk.@ *Id.* at 223.  In support of that conclusion, the authors cited to a Sioux City case study, which showed that crime rose 190% in the area within 500 feet of a new off-site viewing adult bookstore, while crime in a comparable control area rose only 25% during the same period. *Id.* at 223-25.  The study also revealed that the most significant increase in crime occurred during the store=s Aovernight shift@ from 8:00 p.m. to 3:59 a.m.  *Id.* at 227-28.

  The data in the McCleary Article also address some of the concerns expressed by Judge Easterbrook regarding the evidence initially relied upon by the City in enacting the Ordinance.  Unlike those studies, the Sioux City study focused on an adult bookstore without live entertainment and, although the statute at issue there was not an hours of operation ordinance, the study did include a breakdown of crime statistics for daytime versus overnight hours.  At the evidentiary hearing, Dr. McCleary testified that not only did crime increase after the adult bookstore opened in Sioux City, but the character of the crimes observed changed as well, such that, before the store opened, there were no incidences of crimes where life was at risk, but, after it opened, more serious crimes began to occur.  Although this evidence is not by itself determinative of our decision here, the data from Indianapolis coupled with the Sioux City case study are highly persuasive as well as probative in establishing that adult bookstores without live

16

entertainment cause similar secondary effects as adult businesses that do provide live viewing booths.[12]

Having concluded that the City has shown a reasonable basis for its finding that adult bookstores without live entertainment create similar secondary effects as those with such offerings, and that when the Ordinance was in effect those secondary effects were reduced to some degree, we now turn to the issue of whether the reduction in crime attributable to the Ordinance is sufficient to justify the corresponding reduction in speech. This is neither an easy nor a straightforward determination. As Judge Easterbrook recognized in *Annex Books I*: "[B]ecause crime and speech cannot be reduced to a common metric, a direct comparison (how much speech should be sacrificed to achieve how much reduction in crime?) is difficult if not impossible." 581 F.3d at 465-66. However, in an effort to make such a calculation in a way that embraces a rigorous analysis of the evidence presented by the parties, while affording the City "the benefit of the doubt," (*id.* at 466), we hold that the City has shown that the public benefits flowing from the Ordinance are sufficient to justify the regulation without an unjustified, substantial decrease in freedom of speech.

---

[12] In our December 2, 2009 Order granting Plaintiffs' request for a preliminary injunction, we noted that Dr. McCleary's Sioux City study had been heavily criticized in *Dr. John's Inc. v. City of Sioux City*, 438 F. Supp. 2d 1005 (N.D. Iowa 2006), where Dr. McCleary's data was originally submitted in support of Sioux City's regulation of an adult bookstore. However, in response to the court's criticisms, Dr. McCleary supplemented the data, using larger data sets and evaluating crimes within 500 feet of the adult bookstore instead of fifty feet to address the concerns raised by the court in *Dr. John's*. Because the conclusions contained in the McCleary Article are now buttressed by the expanded data, the prior criticisms of the study carry less weight in our analysis.

Plaintiffs attempted to correlate a decline in sales with a decline in speech, but the evidence showed that sales at the stores were declining before enforcement of the Ordinance, and, in fact the pre-enforcement declines in sales were in a number of cases greater than the declines in sales during the enforcement period. Moreover, as the Supreme Court recognized in *Young v. American Mini Theatres, Inc.*, 427 U.S. 50 (1976), although it is often commercial distributors of speech who are in a position to assert the kind of claims asserted here, the First Amendment's concern is not a seller's access to profits, but rather "the central First Amendment concern remains the need to maintain free access of the public to the expression." *Id.* at 77.

Here, no evidence was introduced showing that any book, film, video or magazine was taken off of the shelves or made unavailable to a patron as a result of the Ordinance. Nor was there evidence that any patron was unable to access speech during the enforcement period because he or she could visit the stores only on Sundays or between the hours of midnight and 10:00 a.m. Additionally we note, and the parties have stipulated, that, although adult bookstores are currently free to operate twenty-four hours a day, seven days a week, none of Plaintiffs' stores actually do so. According to the parties' stipulation, Keystone and Annex Books are open 9:00 a.m. to 3:00 a.m., seven days a week. Lafayette is open 10:00 a.m. to midnight, Monday through Thursday as well as on Sunday. On Friday and Saturday nights, Lafayette's hours are 10:00 a.m. to 3:00 a.m. New Flicks went out of business during the time period when the Ordinance was not being enforced and it has not reopened.

Given these facts, there is no persuasive support for a conclusion that the opportunity to purvey expressive materials of the nature sold at Plaintiffs' businesses is curtailed to a significant degree by the Ordinance. We are persuaded that the remaining hours of opportunity for an unfettered dissemination of speech under the Ordinance are sufficient to satisfy the First Amendment and that the Ordinance is not "substantially broader than necessary" to further the City's legitimate interest in reducing the secondary effects described above. *Ward v. Rock Against Racism*, 491 U.S. 781, 800 (1989). In fact, we note, similar hours restrictions have previously been upheld by the Seventh Circuit against First Amendment challenges in other analogous cases. *See Andy's Restaurant*, 466 F.3d at 555-56 (upholding ordinance which, among other regulations, limited operating hours of sexually oriented businesses to 10:00 a.m. to 11:00 p.m., seven days a week); *Schultz v. City of Cumberland*, 228 F.3d 831, 846 (7th Cir. 2000) (upholding a provision of an ordinance "limiting the business hours for sexually oriented businesses to be between 10 a.m. and midnight, Monday through Saturday").

For these reasons, we hold that the City has presented sufficient evidence to establish that the Ordinance satisfies the intermediate scrutiny test set out in *Alameda Books* and its progeny. Accordingly, we declare that the Ordinance 87,2003 is valid under the First Amendment and is thus enforceable by the City. Final judgment shall issue accordingly.

IT IS SO ORDERED.

Date: ____02/25/2013____

*Sarah Evans Barker*
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

J. Michael Murray
BERKMAN GORDON MURRAY & DEVAN
jmmurray@bgmdlaw.com

Lorraine R. Baumgardner
BERKMAN GORDON MURRAY & DEVAN
lbaumgardner@bgmdlaw.com

Steven D. Shafron
BERKMAN GORDON MURRAY & DEVAN
sshafron@bgmdlaw.com

Richard  Kammen
GILROY, KAMMEN & HILL
richard@kammenlaw.com

Scott D. Bergthold
LAW OFFICE OF SCOTT D. BERGTHOLD PLLC
sbergthold@sdblawfirm.com

Bryan A Dykes
LAW OFFICE OF SCOTT D. BERHTHOLD, PLLC
bdykes@sdblawfirm.com

Stephen S. Duggins
LAW OFFICE OF SCOTT D. BERGTHOLD, PLLC
sduggins@sdblawfirm.com

Alexander Phillip Will
OFFICE OF CORPORATION COUNSEL
awill@indygov.org

Richard G. McDermott
OFFICE OF CORPORATION COUNSEL
rmcdermo@indygov.org